Robert KEYER and Joseph Carpenter, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

CIVIL SERVICE COMMISSION OF the CITY OF NEW YORK et al., Defendants.

No. 75 C 608.

United States District Court,
E. D. New York.

July 29, 1975.

Legal Action Center, Inc., for plaintiffs by Harlon L. Dalton, New York City.

W. Bernard Richland, Corp. Counsel of City of New York, New York City, for defendants by Rosemary Carroll, New York City.

### MEMORANDUM AND ORDER FOR PRELIMINARY INJUNCTION

NEAHER, District Judge.

Plaintiffs Robert Keyer and Joseph Carpenter, dismissed New York City Civil Service employees, brought this action under 42 U.S.C. § 1983, 28 U.S.C. §§ 1331, 1343(3) and (4), and 2201, seeking a judgment declaring that their dismissals from employment violated their constitutional rights, directing their reinstatement with back pay, and enjoining future violations of the type complained of. Plaintiffs also sue on behalf of all City civil service employees similarly situated but no class has yet been certified. The case is now before the court on plaintiffs' motion for a preliminary injunction reinstating them in the City's employ and enjoining the dismissal of any members of the class they seek to represent pending the resolution of this controversy. For

the reasons discussed below the motion is granted only as to the named plaintiffs.

The following facts are not in dispute. Plaintiff Keyer was from February 1972 until his dismissal on November 9, 1974, employed by the Board of Higher Education of the City of New York as a Special Officer assigned to the Administration Building of the City University of New York (C.U.N.Y.). "Special Officer" is a competitive civil service position held by persons who function essentially as security guards for various City agencies and departments.[1] In August 1972, Keyer completed his probationary period of employment and became a permanent civil servant.[2] In May 1973 he passed the standard character investigation conducted by the City Personnel Department, and was marked "qualified" for the position to which he had been appointed some fourteen months earlier. After satisfactorily serving as a Special Officer for nearly three years, Keyer was dismissed from employment by the Board of Higher Education solely because the License Division of the Police Department ("License Division") disapproved him for designation as a "Special Patrolman."[3]

Plaintiff Carpenter was from August 23, 1973, until his dismissal on February 28, 1975, employed by the Department of Traffic of the New York City Transportation Administration, initially as a Parking Enforcement Agent in

[1] The City's "Notice of Examination" informs applicants for the position of its requirements as follows:
"MINIMUM REQUIREMENTS: There are no formal education or experience requirements for this position. Proof of good character will be an absolute prerequisite to appointment.
"At the time of appointment, a candidate must qualify for appointment as Special Patrolman by the New York City Police Department. The appointee must maintain his eligibility for Special Patrolman status in order to retain the position of Special Officer.
"DUTIES AND RESPONSIBILITIES: Under general supervision, performs special police work of ordinary difficulty and responsibility; performs related work.
"EXAMPLES OF TYPICAL TASKS: Patrols designated areas of public buildings and surrounding areas to maintain order, preserve the peace, and safeguard life and property against fire, vandalism, theft, etc.; controls vehicular traffic on college campuses and hospital facilities; gives routine information to visitors and clients and directs them to the proper individuals and offices; reprimands and ejects loiterers and disorderly persons; arrests and issues summonses to law violators; escorts persons in custody to police precinct and has arrest recorded on police blotter; requests, completes and forwards arrest card; testifies in court on arrests; make telephone and subsequent written reports on all unusual occurrences; aids sick and injured persons, and calls ambulance when necessary; completes and forwards forms thereon; records daily actions in memo book; maintains rec-
ords of persons entering or leaving buildings outside regular hours of employment; makes clock rounds, as required."
Exh. A, Affidavit of Dr. David Newton in Opposition to Plaintiffs' Motion, etc.

[2] New York Civil Service Law § 63 provides that "every original appointment to a position in the competitive class . . . shall be for a probationary term." This statute has been construed to mean that every civil service appointment "shall have a probationary term which has the possibility of ripening at its conclusion into a permanent appointment." *Koso v. Greene*, 260 N.Y. 491, 494–95, 184 N.E. 65, 66 (1933); *Halpin v. Reile*, 64 Misc.2d 1023, 316 N.Y.S.2d 819, 822 (Sup. Ct.1970). New York City Civil Service Commission Rule 5.2.1(a)(19) prescribes a six-month limit on probationary service.

[3] The New York City Administrative Code § 434a–7.0, subd. (e), empowers the City's Police Commissioner to "appoint" Special Patrolmen "upon the application of the head of any agency . . . to do special duty at any place in the city, on behalf of such agency" and also to revoke such an appointment "without assigning cause therefor." A legislative memorandum which accompanied the 1970 enactment of subdivision (e) explained its purpose as follows:
"Special Patrolmen are designated as such in order to have the power to issue summonses and take other necessary police action in the limited area of enforcement of the laws and rules and regulations, *within the jurisdiction of the agency wherein such employees are employed*. Essentially, they perform custodial and protective services." (Emphasis in original.)

which capacity he issued parking tickets and subsequently as a Traffic Control Agent in which capacity he directed traffic and issued summonses for parking and moving violations. In February 1974, he completed his probationary period of employment and became a permanent civil servant. After satisfactorily serving for a year and a half, Carpenter was dismissed from employment by the Transportation Administration solely because the License Division refused to approve him for designation as a Special Patrolman. The City Personnel Department apparently never completed its standard background investigation of Carpenter.[4]

There is no question that both plaintiffs successfully passed through each stage of the civil service process leading to their appointment in the respective positions they held when dismissed. These included scoring high enough in written examinations to attain eligibility ratings, passing medical and physical tests, surviving interviews by appointing agencies and the so-called "one-in-three rule"; i. e., being chosen in preference to two other prospective appointees. Keyer also passed the character screening investigation conducted by the City Personnel Department. Carpenter, apparently because of administrative backlogs, had not yet been subjected to it when dismissed and it is not the reason for his termination. In

addition, as already noted, each plaintiff had survived the six months probationary period during which the appointing agencies must make a specific determination as to whether an appointee has performed satisfactorily and should be continued on the job in permanent civil service status, see n. 2 supra.

It also appears beyond doubt that during the entire periods of their employment Keyer, as a Special Officer, and Carpenter, as a Traffic Control Agent, were required to perform and did perform the identical duties without "Special Patrolman" designation that they would have performed had they received such a designation. While the documentation provided by the City on the hearing is incomplete, enough appears to warrant the finding that neither plaintiff was requested to apply for "Special Patrolman" status until long after his probationary period had ended. Thus Keyer's application to the License Division is dated February 26, 1974—two years after he had entered on active duty as a Special Officer.[5]

Carpenter, a former Port Authority probationary police officer, has been directing traffic, enforcing traffic regulations and issuing tickets for violations since he entered on duty in August 1973.[6] At his "hearing" before the License Division, protesting the refusal to designate him as a Special

4. However, another City agency, the Taxi and Limousine Commission, completed its investigation into his background in 1973 and awarded him a cab driver's license after being satisfied that he possessed the requisite good character.

5. Exh. B, Affidavit of Rosemary Carroll, Esq., dated July 17, 1975.

An earlier affidavit of Ms. Carroll, dated July 9, 1975, provided a transcript of Keyer's "hearing" before the License Division which is also revealing in this connection. Ironically, Keyer, an ex-United States Marine and a holder of three awards for successful completion of the City's Patrolman Cadet Project in 1968, had previously been employed by the Department of Social Services as a Special Officer and had been deputized as a Special Patrolman under previous Administrative

Code provisions. An arrest he made of a fellow worker, which he believed at the time to be lawful, resulted in a criminal charge against him after a union successfully sued to invalidate the Police Commissioner's power to deputize City employees as Special Patrolmen. See Del Giorno v. Police Department, 33 A.D.2d 665, 305 N.Y.S.2d 63 (1st Dep't 1969), aff'd, 26 N.Y.2d 821, 309 N.Y.S.2d 354, 257 N.E.2d 900 (1970). It was that court decision which prompted the amendment adding subd. e to § 434a–7.0 of the Code, see n. 3 supra. The resulting harassment conviction, however, was one of the items apparently considered by the License Division in refusing to designate Keyer again as a Special Patrolman. Exh. A, Tr. pp. 3–6.

6. Exh. B, Affidavit of Rosemary Carroll, Esq., dated July 9, 1975.

Patrolman, the following illuminating interchange occurred:

"HEARING OFFICER: All right; now at the present time you do not have deputization as a special patrolman. If you were deputized would your duties and/or responsibilities change?

"MR. CARPENTER: No, they would not.

"HEARING OFFICER: Now, would you have summonsing powers as a special patrolman?

"MR. CARPENTER: Yes.

"HEARING OFFICER: In other words—are you qualified now to issue summonses?

"MR. CARPENTER: Yes; I've been trained in the proper procedure for issuing summonses.

"HEARING OFFICER: All right, now why would it be necessary then—since your duties and responsibilities wouldn't change, why would it be necessary for you to be deputized as a special patrolman?

"MR. CARPENTER: It would be necessary so that the summonses that I do issue would be legal in the eyes of the law; so that I am a special patrolman in the eyes of the law.

"HEARING OFFICER: Do you issue summonses now?

"MR. CARPENTER: Yes.

"HEARING OFFICER: Are these summonses you issue legal?

"MR. CARPENTER: Yes. I was unaware of the fact that I had not been appointed a special patrolman until I received notice from this Department that my application had been refused."[7]

In bringing this action plaintiffs claim that they were deprived of their Fourteenth Amendment rights to procedural due process and equal protection of the laws in that:

1. They were summarily dismissed from permanent civil service positions without notice of charges and the hearing required by New York Civil Service Law § 75.[8]

2. The Special patrolman requirement is a vague and essentially honorific criterion, wholly unrelated and functionless to the performance of their duties.

3. The License Division procedure by which they were refused designation as Special Patrolmen did not afford them an opportunity to know what information was relied on by the reviewing officer or to explain or rebut it.

Plaintiffs recognize that to succeed on their motion for preliminary injunctive relief they must demonstrate either (1) a probability of success on the merits and possible irreparable in-

---

7. *Id.* at pp. 3–5.

8. N.Y. Civil Service Law § 75 provides in pertinent part:

"1. Removal and other disciplinary action. A person described in paragraph (a) . . . of this subdivision shall not be removed or otherwise subjected to any disciplinary penalty provided in this section except for incompetency or misconduct shown after a hearing upon stated charges pursuant to this section.

"(a) A person holding a position by permanent appointment in the competitive class of the classified civil service . . .

\* \* \* \* \*

"2. Procedure. A person against whom removal or other disciplinary action is proposed shall have written notice thereof and of the reasons therefor, shall be furnished a copy of the charges preferred against him and shall be allowed at least eight days for answering the same in writing. The hearing upon such charges shall be held by the officer or body having the power to remove the person against whom such charges are preferred, or by a deputy or other person designated by such officer or body in writing for that purpose. . . . The person or persons holding such hearing shall, upon the request of the person against whom charges are preferred, permit him to be represented by counsel, and shall allow him to summon witnesses in his behalf. The burden of proving incompetency or misconduct shall be upon the person alleging the same. . . . "

jury; or (2) that they have "raised questions going to the merits so serious substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation", and that "the balance of hardships tips decidedly" in their favor. *Checker Motors Corp. v. Chrysler Corp.*, 405 F.2d 319, 323 (2 Cir.), *cert. denied*, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969); *Chance v. Board of Examiners*, 330 F.Supp. 203, 224 (S.D.N.Y. 1971), aff'd, 458 F.2d 1167, 1178 (2 Cir. 1972). Whether they have made such a showing must now be determined.

### 1. *Probability of Success*

██ There can be no question that municipal civil service employees who have successfully passed the six months probationary period may not thereafter be removed from their positions without being afforded a hearing upon stated charges of incompetency or misconduct preferred in writing and served in advance. N.Y. Civil Service Law § 75, n. 8 *supra*. An employee entitled to such protection but who is summarily dismissed may sue under 42 U.S.C. § 1983 and obtain prompt relief ordering his reinstatement with back pay retroactive to the date of his dismissal. *Vega v. Civil Service Commission, City of New York*, 385 F.Supp. 1376 (S.D. N.Y. 1974). This remedial principle is recognized in other jurisdictions. See *Newcomer v. Coleman*, 323 F.Supp. 1363 (D.Conn.1970), and *Roumani v. Leestamper*, 330 F.Supp. 1248 (D. Mass. 1971).

██ In resisting the preliminary relief plaintiffs seek, the defendants' position at first blush seemed to be that the plaintiffs never became civil service employees entitled to the protection of Civil Service Law § 75. Such a position would be incomprehensible on the record before the court. There can be no doubt that plaintiffs were selected and ap-

pointed to their respective positions entirely by operation of the standard civil service process.

What the defendants, on closer analysis, really contend is that the plaintiffs failed an important prerequisite of their jobs, *i. e.*, qualification for appointment as a "Special Patrolman", of which they had notice, see n. 1, *supra*. In other words, that they "were hired upon condition that (i) subsequent investigation demonstrate they possess the requisite moral character, and (ii) they achieve Special Patrolman designation from the License Division . . . ."[9] Thus defendants heavily rely on a document signed by Keyer (and presumably by Carpenter) some ten days before the date of his appointment on February 22, 1972.[10] That document, entitled "Terms and Conditions of Certification and Appointment (or Promotion)" states, *inter alia:*

"1. That this certification and appointment is made subject to my qualifying in the appropriate character investigation, medical examination and such other qualifications as provided by the Civil Service Law, the Civil Service Rules and Regulations and the advertisement for the above position.

\* \* \* \* \* \*

"3. That failure to fulfill any of these conditions will result in the revocation of such certification and appointment (or promotion)." [11]

The asserted failure to fulfill conditions, however, did not occur until long after the probationary term of each plaintiff had expired. Defendants' contention that such a post-probationary development summarily put an end to the plaintiffs' civil service status and rights would nullify the plain meaning of Civil Service Law § 75 and completely frustrate the purpose of the mandatory probationary period provided for in §

---

9. Defendants' Memorandum of Law, fourth unnumbered page.

10. Exh.D, Aff. of Rosemary Carroll, Esq., dated July 17, 1975.

11. *Id.*

**1368**

63, n. 2 *supra*. "The probationary period of appointment . . . is designed and intended to determine *finally* [emphasis supplied] the appointee's *actual* [emphasis in orginal] ability to perform satisfactorily" (citations omitted). *Altman v. Lang*, 44 Misc.2d 751, 255 N.Y. S.2d 284, 289 (Sup.Ct., N.Y.), *aff'd* 23 A.D.2d 820, 259 N.Y.S.2d 779 (1st Dep't), *aff'd*, 17 N.Y.2d 464, 266 N.Y.S. 2d 975, 214 N.E.2d 157 (1965). The Civil Service Law and rules applicable to those in the City's employ permit summary termination of employment because of unfitness only during or at the end of the probationary period. *Application of Going*, 5 A.D.2d 173, 170 N.Y.S.2d 234, 238–39 (1st Dep't 1958).

Even Civil Service Law § 50, subd. 4—which defendants do not mention—would not sanction the summary dismissal to which plaintiffs here were subjected. That statute empowers a local civil service commission to revoke an "eligible's certification and appointment and direct that his employment be terminated" if facts are subsequently found "which if known prior to appointment would have warranted his disqualification, or upon a finding of illegality, irregularity or fraud of a substantial nature in his application . . . ." The revocation or termination, however, must occur not later than three years after certification or appointment is made, "except in the case of fraud." Section 50, subd. 4, expressly provides that "[n]o person shall be disqualified . . . unless he has been given a written statement of the reasons therefor and afforded an opportunity to make an explanation and to submit facts in opposition to such disqualification." The statute has been construed to warrant a hearing when required by the circumstances to the case. *Canarelli v. New York State Department of Civil Service*, 44 A.D.2d 645, 353 N.Y.S.2d 275, 277 (4th Dep't 1974).

Although defendants do not rely upon or even advert to § 50, subd. 4, they none-

theless characterize Keyer's applications as "evasive" and "selectively omit[ting] critical information concerning his past." They concede, however, that Carpenter "answered all questions about his background truthfully."[12]

▉ The court has examined Keyer's civil service personal history questionnaire (PHQ) and Special Patrolman application attached to the foregoing affidavit and finds the defendants' criticisms to be without substance. He answered truthfully on the (PHQ) that he had been courtmartialed while in the Marine Corps (1958–1962) and was convicted and fined $100 for the offense of harassment in New York (1970)—the same offense which grew out of the prior invalidation of the Special Patrolman practice, n. 5, *supra*, when he was a Special Officer in the Department of Social Services. The PHQ item 26 did not call for prior arrest, only convictions. The Special Patrolman application, although signed by Keyer, was apparently prepared by his agency employer and exhibits no inconsistency with his PHQ answers. Neither document would support a conclusion that Keyer withheld information "which if known prior to appointment would have warranted his disqualification" for the position of Special Officer. Civil Service Law § 50, subd. 4.

Far from inculpating plaintiffs, the documents disclose the City's inexcusable delay and total disregard for the letter and spirit of the Civil Service Law in processing the Special Patrolman applications upon which so much importance is placed. While the court is inclined to doubt that importance for reasons noted below, it is clear that such an investigation could have been completed within the six months probationary period. Keyer was appointed on February 22, 1972. His employer, the Board of Higher Education, never got around to submitting its request for his designation as a Special Patrolman until February 28, 1974—over two years after

12. Affidavit of Rosemary Carroll, Esq., dated July 17, 1975, pars. 5, 9, 12.

Keyer was on the job! Almost six months to the day—August 30, 1974—the Police Department had completed its investigation and given its final disapproval.[13] During all that time the employing agency was content to have Keyer on duty without Special Patrolman designation.

Plaintiffs contend with some force that the Special Patrolman designation is a meaningless honorific title having no reasonable relationship to the functions they perform. As already indicated, *supra* pp. 1365 even the License Division hearing officer wondered why it was necessary for Carpenter—a Traffic Control Agent—to be so deputized. His wonderment appears to be well founded. Since August 20, 1973, the Police Department no longer has—if it ever had—a monopoly on the issuance of summonses or other criminal process. On that date the City Council enacted a local law conferring concurrent jurisdiction on the Transportation Administration

> "with the police department to enforce all laws, rules and regulations prohibiting, regulating, directing, controlling or restricting both the parking of vehicles and movement and conduct of vehicular and pedestrian traffic in and on all streets,
>
> \* \* \* \* \* \*
>
> "(b) The administration may employ, hire and retain officers, agents and employees for the purpose of enforcing all laws, rules and regulations prohibiting, regulating, directing, controlling or restricting the parking of vehicles and the movement and conduct of vehicular and pedestrian traffic, *which officers, agents and employees are hereby authorized, empowered and designated to issue, make and serve tickets, summonses and complaints for traffic infractions* . . . simplified traffic informations . . . appearance tickets for

traffic infractions, misdemeanors and violations related to the movement and conduct of vehicular traffic . . . and to issue, make and serve notices of violation for parking violations . .." (Emphasis supplied.)

New York City Charter, Chap. 63–A, § 2103 as amended by L.L. 1973, No. 48, August 20.

The foregoing provisions would seem to remove any need for Special Patrolman designation in Carpenter's case. They are of no benefit to Keyer in his employment with the Board of Higher Education. Although he claims he was on duty between 4:00 P.M. and 8:00 A.M., when the building was closed to the public and most employees, a vice-chancellor of C.U.N.Y. avers that it is important for Special Officers to have "power to issue summonses and . . . make arrests" in dealing with demonstrators, disorderly persons, and others who may attempt to steal Board property.[14] Obviously, however, if Keyer could perform his duties for nearly three years without such power, the function and essentiality of the Special Patrolman designation is seriously called into question.

Substantial questions requiring more deliberate investigation are also raised by plaintiffs' attack on the procedures by which the License Division denied them Special Patrolman designation. It appears that during the entire *ex parte* investigation and decision-making process, neither the employing agency nor the applicant is advised as to information compiled or afforded adequate opportunity to answer or explain whatever facts or information may have been relied on to disapprove an application. Although the applicant may later appeal and be heard in person, with the assistance of counsel or other representative, he does so again without access to the file and knowledge of the basis for the adverse decision. Defendants'

---

13. Exh.B, Affidavit of Rosemary Carroll, Esq., dated July 17, 1975.

14. Affidavit of Dr. David Newton dated July 8, 1975, pars. 9–11.

contention that such a post-decision appeal satisfied the notice and hearing requirements of the Civil Service Law is without merit.

■ Accordingly, the court finds and concludes that plaintiffs have demonstrated a strong probability of success on the merits of their claim that they were deprived of constitutional rights of due process and equal protection of the law in being summarily discharged from their civil service positions.

### 2. *Possible Irreparable Injury*

■ By training and experience plaintiffs are qualified for employment in a fairly limited and specialized field— non-police security and law enforcement work. As one of defendants' affidavits [15] points out, in the City of New York there are only 8,000 in plaintiffs' occupational category who hold the designation of Special Patrolman, 6,000 of whom are in the City's employ. Opportunities for private employment are thus relatively limited.

Plaintiffs' experience has confirmed this fact. Keyer was unable to find work from the date of his dismissal on November 9, 1974 until June 23, 1975. The job he did find was only a four-months temporary vacation fill-in for security guards on vacation, and at a substantially smaller salary. His dismissal by the City is a stigma which has hindered his efforts to find work in an extraordinarily tight job market. To support himself and family he has had to incur substantial debt and judgments against him have been obtained by creditors.

Carpenter has not fared much better. Although he found a temporary job shortly after his dismissal by the City —at half the salary—it ended four months ago and he is presently unemployed. He, too, has incurred substantial debt for personal living expenses and has suffered from the stigma of his dismissal by the City.

Both plaintiffs have not only lost job security, health insurance coverage and pension benefits but also reasonable expectations of advancement in their civil service careers. The longer they remain away from their chosen work, the greater are the chances that advancement will go to others. Eventual reinstatement, should they prevail in this action, will not adequately recompense them for the opportunities of promotion which in the interim pass them by. They need such relief now.

■ In cases such as this where *prima facie* a clear violation of constitutional rights is apparent, courts have not hesitated to order prompt reinstatement with back pay. Although not a preliminary injunction case, *Vega v. Civil Service Commission, supra,* is apposite because of its basic similarity to this case.

In *Vega,* as here, the plaintiff, a City correction officer, had been summarily dismissed without a hearing. The asserted ground of dismissal was the discovery, eleven days after he had satisfactorily completed his probationary period, that he was over age at the time he took the civil service examination and thus disqualified for employment. Vega, as did plaintiffs here, had signed the "Terms and Conditions of Certification and Appointment (or Promotion)" form certifying his understanding that his appointment was conditional and could be terminated if upon subsequent investigation he was found to be not qualified.

In *Vega's* subsequent § 1983 action, Judge Knapp nonetheless granted him summary judgment, directing the City to reinstate him as a correction officer with back pay. The court held that under the New York cases reviewed in its opinion, "the Commission has no inherent authority to fire a civil servant once his appointment has become finalized." 385 F.Supp. at 1380. The City's express contention that Vega's employment was conditional and that Civil Service Law

---

15. Affidavit of Peter J. Maloney, Commanding Officer, N.Y.C.P.D. License Division, dated July 9, 1975, par. 2.

§ 50, subd. 4, gave it such authority was rejected. Judge Knapp pointed out that the plaintiff in *Vega* had truthfully stated the fact of his age and that there was no claim of illegality, irregularity or fraud in the application.

There is no such claim in this case either, only the contention that the City did not learn of the License Division's refusal to designate the plaintiffs as Special Patrolmen until long after their appointments had become finalized. But, as noted above, this was a matter entirely within the City's control; its failure to act with reasonable promptness in obtaining the requisite information militates strongly against the merits of its position.

Other federal courts have not hesitated to grant preliminary injunctive relief in summary dismissal cases. In *Newcomer, supra,* the plaintiff, suing under § 1983, was the executive director of a city housing authority in Connecticut. He had been summarily dismissed from his employment by the commissioners without the prior notice and hearing granted to other employees under the personnel policies of the authority. He also claimed that his reputation had been stigmatized by attendant publicity which hindered his efforts to gain other employment. The court, finding that the plaintiff might not be able to find a new job until he had been given an opportunity to confront the charges and thus clear his name, granted a preliminary injunction prohibiting his dismissal without his first being accorded notice of the charges against him and a full and fair hearing in accordance with established concepts of due process.

In *Roumani, supra,* the plaintiff, a nontenured assistant professor under a renewable annual contract, had been dismissed without a hearing after he had refused to resign his post. He was thereafter informed that his contract would not be renewed. In suing under § 1983, he claimed that the defendants had refused to honor an implied agreement to renew his contract for the next academic year and that he was entitled before removal to have certain procedural safeguards. The court noted that the plaintiff had never received a statement specifying what he had done or any hearing on the matter. Stressing the plaintiff's arguably protectable interests of expectancy of continued employment and the protection of his professional reputation, the court granted a preliminary injunction prohibiting the defendants from failing to renew his contract for the succeeding academic year unless they previously provided him with a particularized statement of the charges against him, an opportunity to be heard with counsel, and a notice of their decision.

In light of the foregoing cases, it would be most inequitable to grant preliminary injunctive relief to executives and professors and deny it to more humble civil servants such as these plaintiffs, as defendants contend. Section 1983 by its terms negates any such distinction. It applies to "[e]very person" whose "rights, privileges, or immunities secured by the Constitution and laws" have been denied him under color of State law.

*Sampson v. Murray,* 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974), upon which defendants mainly rely, cannot be read as barring such injunctive relief here. On the contrary, *Sampson* recognized "that cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found." 415 U.S. at 92, n. 68, 94 S.Ct. at 953, n. 68. Although the Court in *Sampson* also noted its disagreement with the view that "loss of earnings or damage to reputation might afford a basis for a finding of irreparable injury and provide a basis for temporary injunctive relief", *id.* at 952, the factual context there was markedly different from that presented here. In *Sampson,* the plaintiff was but a probationary employee and still had open avenues of administrative appeal. In this case, we are not dealing with mere "procedural irregulari-

ties in effectuating respondent's discharge", *id.* at 953, as in *Sampson,* but with a total denial of due process which has had the effect of terminating permanent civil service employment and stigmatizing the plaintiffs in an occupation peculiarly susceptible to such a stigma.

On this record, the court finds and concludes that plaintiffs have sufficiently shown a probability of success on the merits and the possibility of irreparable injury, not compensable in monetary damages, if they are not promptly reinstated in their respective civil service positions with back pay and restored to full seniority and other benefits pending further proceedings herein. The preliminary injunction herein granted does not apply to persons not yet parties to this action. Nor will it bar the defendants, if they have ground therefor, from proceeding against the plaintiffs as provided in Civil Service Law § 75. In view of the circumstances, there is no need for security.

An order including the foregoing provisions shall be submitted for settlement and signature no later than July 31, 1975 at 4:00 P. M.

So ordered.